❒ Original

CLERK'S OFFICE
A TRUE COPY
Dec 15, 2020
s/ Jeremy Heacox
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

Two Facebook Accounts Associated with
Tabitha Scruggs

)
)
)
)
)
)

Case No. **20-M-487 (SCD)**

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____

*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before        12-29-20        *(not to exceed 14 days)*

❒ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to        Hon. Stephen Dries        .
*(United States Magistrate Judge)*

❒ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❒ for _____ days *(not to exceed 30)*   ❒ until, the facts justifying, the later specific date of _____ .

Date and time issued:        12-15-20. 2:05 pm

*Judge's signature*

City and state:        Milwaukee, Wis

Hon. Stephen Dries, U.S. Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**<u>ATTACHMENT A</u>**

**Property to Be Searched**

Matter No. 2020R00324

This warrant applies to information associated with two Facebook Accounts: "Tabby Cat," associated with Facebook ID 100056406363777, and "Tabby Abby," associated with Facebook ID 100051579196107,  that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

**ATTACHMENT B**

**Particular Things to be Seized**

I.     **Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)     All contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)     All activity logs for the account and all other documents showing the user's posts and other Facebook activities from August 22, 2020, to the present;

(c)     All "Stories" posted by the account from August 22, 2020, to the present;

(d)     All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from August 22, 2020, to the present, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(e)     All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which

the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(f)     All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(g)     All other records and contents of communications and messages made or received by the account from August 22, 2020, to the present, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(h)     All "check ins" and other location information;

(i)     All IP logs, including all records of the IP addresses that logged into the account;

(j)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(k)     All information about the Facebook pages that the account is or was a "fan" of;

(l)     All past and present lists of friends created by the account;

(m)     All records of Facebook searches performed by the account from August 22, 2020, to the present;

(n)     All information about the user's access and use of Facebook Marketplace;

(o)     The types of service utilized by the user;

2

(p)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(q)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(r)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within thirty days of issuance of this warrant.

**II.    Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 18, United States Code, Sections 2, 844(i), and 844(n), involving Tabitha Scruggs or Devon Vaughn, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a)  Evidence related to arson and civil unrest activity;

(b)  Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c)  Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(d)  The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s); and

(e)  Evidence indicating that any person attempting to obstruct or impede investigations related to arson.

4



CLERK'S OFFICE
A TRUE COPY
Dec 15, 2020
s/ Jeremy Heacox
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

Two Facebook Accounts Associated with Tabitha Scruggs

)
)
)
)
)
)

Case No. **20-M-487 (SCD)**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❑ contraband, fruits of crime, or other items illegally possessed;

❑ property designed for use, intended for use, or used in committing a crime;

❑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18, U.S.C., Sections 2 and 844 | arson |

The application is based on these facts:

See the attached affidavit.

☑ Continued on the attached sheet.

❑ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

ATF TFO Alexis Krusic

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

telephone *(specify reliable electronic means).*

Date: 12-15-20

*Judge's signature*

City and state: Milwaukee, Wis

Hon. Stephen Dries, U.S. Magistrate Judge

*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

**Matter No. 2020R00324**

I, Task Force Officer Alexis Krusic, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2.      I am a Task Force Officer (TFO) of the United States Justice Department, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), currently assigned to the Milwaukee Field Office. I am also a Sheriff's Deputy with the Milwaukee County Sheriff's Office (MCSO). I have been employed with MCSO since January of 2016 and a TFO since March 2020.  My duties as a TFO with ATF include investigating alleged violations of the federal firearms, explosives, and arson statutes. My duties with MCSO include investigating state violations of all criminal offenses.

3.      I have completed approximately 920 hours/6 months of training at the Milwaukee County Sheriff's Office Training Academy through the Wisconsin Law Enforcement Standards Bureau.  That training included various legal courses related to Constitutional Law as well as

search and seizure authority. Additionally, I have received training on how to conduct various tasks associated with criminal investigations, such as: interviewing, surveillance, and evidence collection. I have experience with investigations into commercial arsons and criminal damage to property. I have read reports and worked with other officers/agents in complex investigations where I know that criminals put information on social media platforms to convey a message to groups of people.

4.      In addition to my duties as a criminal investigator, I am also a member of the Milwaukee County Sheriff's Office Explosives Ordinance Disposal (EOD) Unit, who specializes in explosives. I have been a member on the unit for approximately 1 year. As a member of the EOD unit, I assist with conducting post-blast investigations in Milwaukee County and Sheboygan County. I assist with the recognition and disposal of devices.

5.      Through my experience and training as a firearm, arson, and explosives investigator, I am aware that social media sites, such as Facebook, can be used to store and save audio, video, and text files that can link to a variety of criminal activity. I am also aware that social media sites, such as Facebook, are often used by witnesses to crime to record criminal activity.

6.      I have previously applied for and received search and arrest warrants related to the crime of arson, as well as other crimes.

7.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

2

8.     Based on my training and experience and the facts, as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Sections 2, 844(i), and 844(n) (arson, aiding-and-abetting) have been committed by Tabitha Scruggs and Devon Vaughn. There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## FACEBOOK FUNCTIONALITY

9.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

10.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

11.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account

3

includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

12.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

13.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

14.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link

4

to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

15. Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

16. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

17. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

18. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

19. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through

the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

20. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

21. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

22. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

23. Facebook further maintains a functionality it refers to as "Stories," whereby users can post photos and videos using Facebook's "in app" camera, frequently utilizing filters and additional text. After a user "posts" a "Story," the "Story" will be available to their "friends" for a 24-hour period, appearing at the top of their "News Feed" in the application.

24. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical

problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

25. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information

7

may tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.  For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

26.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## PROBABLE CAUSE

27.     On August 23, 2020, Jacob Blake was shot multiple times by officers of the Kenosha Police Department. That incident triggered both non-violent protests and violent rioting, including numerous arsons throughout the City of Kenosha. The unrest and violence grew so dangerous that the Wisconsin National Guard eventually deployed over 1,000 individuals to keep the peace. The Government also marshaled its resources to investigate crimes in the aftermath.

28.     ATF's National Response Team (NRT) and the Milwaukee Field Office, in partnership with the Kenosha Police Department, Kenosha Fire Department, Kenosha Sheriff's Office, Drug Enforcement Administration, Wisconsin Department of Justice's Division of Criminal Investigation, and the United States Attorney's Office are focusing their efforts on identifying the persons responsible for twenty building arsons, seven vehicle arsons, and other related crimes that occurred in Kenosha between Sunday, August 23, 2020 and Tuesday, August

8

25, 2020. Those investigators processed scenes, collected video evidence, and identified

potential witnesses, subjects, and targets. The instant warrant application is made as a part of this

same investigative effort.

29.     In conjunction with other federal, state, and local law enforcement officers, I am

assisting with an investigation into an arson at B&L Office Furniture, located at 1101 60th Street,

in Kenosha, Wisconsin ("B&L"), on August 24, 2020. As part of the investigation into this arson

at B&L, law enforcement reviewed a video publicly posted on the social media platform Twitter,

which depicted a white male subject (wearing a black baseball cap, black tank top, blue surgical

mask, and bearing a large left forearm tattoo, which itself featured a distinctive "straight edge"

on the top) lighting a piece of material (believed to be either paper or cardboard) on fire, placing

that same burning material on a table in front of B&L, and leaving the area.

30.     Law enforcement located additional footage of a person matching the description

of the white male mentioned above, also generated in Kenosha on the evening of August 24,

2020. A still image generated using this same footage was released to the media, and citizens

with any knowledge of this person's identity were asked to contact law enforcement at an

established "tip line."

31.     A citizen who wished to remain anonymous ("CW No. 1") contacted this "tip

line" and advised that his son ("CW No. 2"), who also wished to remain anonymous, was

familiar with the white male described above. CW No. 1 explained that CW No. 2 was connected

on Facebook and Snapchat with a woman (later identified as Tabitha Scruggs ["Scruggs"])

whose boyfriend matched the picture released to the media. Law enforcement interviewed CW

No. 2, at which point CW No. 2 (i) explained that Scruggs' Facebook profile name was "Tabby

Abby"; and (ii) provided a still photo associated with that same Facebook profile, which depicted

9

Scruggs' boyfriend Devon Vaughn ("Vaughn"). In the picture, Vaughn is wearing the same hat as the B&L arsonist and displays a tattoo on his left forearm with a straight edge in the same location as the B&L arsonist.

32.     On September 3, 2020, law enforcement interviewed Scruggs outside of 3827 Republic Avenue in Kenosha, WI. This is the residence of Scruggs' grandmother, Eileen Scruggs ("Eileen").

33.     Eileen initially answered the door, at which point law enforcement asked if "Tabitha" lived at the residence. Eileen responded that they had just missed her. Eileen eventually offered to call Scruggs. This call was placed, and Scruggs arranged to return to the residence.

34.     While waiting for Scruggs to return, law enforcement asked Eileen if she knew of Scruggs' boyfriend. Eileen said she did, and his name was Devon.

35.     Law enforcement showed Eileen a picture of Devon, from Scruggs' Facebook account, and asked Eileen if that was Devon, Scruggs' boyfriend. Eileen said it was.

36.     When Scruggs returned to the residence, law enforcement interviewed her. Initially Scruggs stated she went to downtown Kenosha by herself, but she eventually acknowledged going downtown with her friend Devon. Scruggs claimed she did not know Devon's last name or cell phone number. Scruggs stated she had known Devon for three months and that they had originally met through Facebook.

37.     Scruggs stated that Devon drove her, using her vehicle, to downtown Kenosha during the night of "the shooting" in Kenosha. She further stated that Devon continuously left her while they were downtown, and she was not around him for a majority of the time. Scruggs claimed she kept trying to call Devon because she wanted to leave, and Devon told her to just

leave him if she did not want to stay. Scruggs ended up leaving Devon downtown because he did not want to leave.

38.     Later that day, law enforcement met again with Scruggs, at her request. Law enforcement showed Scruggs the photo of Vaughn taken during the B&L arson, and asked Scruggs if she thought it was her boyfriend. Scruggs initially stated she did not know if that was him or not. After looking at the photo for a while, Scruggs stated the photo did "kind of" look like him, and that the hat and tattoo did look like Devon's.

39.     Scruggs and her counsel signed a "proffer letter" with the government, whereby Scruggs agreed to provide "a complete and truthful account of all information she has regarding all criminal wrongdoing perpetrated by herself or others." This "proffer letter" contained what is colloquially referred to as a "*Kastigar* waiver," which provided that the government was entitled "to use information derived directly or indirectly from [Scruggs'] statements for the purpose of obtaining and pursuing leads to other evidence, which derivative evidence may be used for any purpose, including any prosecution of her by the United States."

40.     On October 15, 2020, Scruggs and her counsel met with the government for this proffer interview.  Law enforcement does not believe that Scruggs was fully truthful during that conversation, but she did make certain statements that (i) the government believes were truthful; and (ii) support the instant warrant application. To wit: Scruggs acknowledged entering the B&L furniture store with Vaughn the night of the arson. Scruggs further stated that she personally saw Vaughn start a fire inside the store.

41.     During this same interview, the government showed Scruggs a photograph (obtained from a publicly-available source) depicting the inside of the B&L furniture store the night of the arson. Scruggs acknowledged that (i) she was the female figure in the photo, and (ii)

Vaughn was the figure in the black tank top to the far left. Scruggs said she was either videotaping or watching the fire in this photo, and she initialed the photo to commemorate her identifications. A copy of the initialed photo follows:



42.     Scruggs also told the government that day that she was driven to the proffer interview by Vaughn, and that the two had recently communicated regarding the investigation into the Kenosha arsons.

43.     Law enforcement was able to identify a Facebook account maintained by Devon Vaughn, by reviewing publicly-available information. Vaughn's account bears the profile name "Devon Vaughn," and is associated with Facebook ID 100008487691518. Law enforcement obtained a search warrant for this same account and has begun reviewing material provided by Facebook pursuant to that same warrant. This analysis is ongoing, but law enforcement has made several important findings so far:

- Scruggs is using two Facebook Accounts to communicate with Vaughn. The first account bears profile name "Tabby Cat" and is associated with Facebook ID 100056406363777. The second account bears the profile name "Tabby Abby" and is associated with Facebook ID 00051579196107.  Your affiant has concluded these are Scruggs' accounts based on, *inter alia*, my review of communications associated with these accounts, and the high degree of similarity I have observed between Scruggs' personal appearance (which I am familiar with from several in-person interactions) and photos depicting the user of these accounts.

- Scruggs and Vaughn are using these Facebook accounts to communicate regarding the arsons in Kenosha and their related legal exposure. To summarize and paraphrase, the communications reflect an attempt to "get their stories straight" and Scruggs' insistence to Vaughn that "if she goes down, he goes down too."

13

44.     Given Scruggs' and Vaughn's involvement in the arson at B&L; their use of their Facebook accounts to communicate regarding their related legal exposure; and Scruggs' lack of candor during the proffer interview, I submit that there is probable cause to search the information identified in Attachment A for evidence of violations of Title 18, United States Code, Sections 2, 844(i), and 844(n), as described in Attachment B.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

45.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

46.     Based on the foregoing, I request that the Court issue the proposed search warrant.

47.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Facebook. Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

48.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. *See* 18 U.S.C. §§ 2703(a), (b)(1)(A) &

14

(c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

15

## **ATTACHMENT A**

**Property to Be Searched**

Matter No. 2020R00324

This warrant applies to information associated with two Facebook Accounts: "Tabby Cat," associated with Facebook ID 100056406363777, and "Tabby Abby," associated with Facebook ID 100051579196107,  that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

### Particular Things to be Seized

**I. Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

    (a)    All contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

    (b)    All activity logs for the account and all other documents showing the user's posts and other Facebook activities from August 22, 2020, to the present;

    (c)    All "Stories" posted by the account from August 22, 2020, to the present;

    (d)    All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from August 22, 2020, to the present, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

    (e)    All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which

the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(f)     All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(g)     All other records and contents of communications and messages made or received by the account from August 22, 2020, to the present, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(h)     All "check ins" and other location information;

(i)     All IP logs, including all records of the IP addresses that logged into the account;

(j)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(k)     All information about the Facebook pages that the account is or was a "fan" of;

(l)     All past and present lists of friends created by the account;

(m)     All records of Facebook searches performed by the account from August 22, 2020, to the present;

(n)     All information about the user's access and use of Facebook Marketplace;

(o)     The types of service utilized by the user;

2

(p)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(q)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(r)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within thirty days of issuance of this warrant.

**II.    Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 18, United States Code, Sections 2, 844(i), and 844(n), involving Tabitha Scruggs or Devon Vaughn, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a)  Evidence related to arson and civil unrest activity;

(b)  Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c)  Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(d)  The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s); and

(e)  Evidence indicating that any person attempting to obstruct or impede investigations related to arson.

4